(Slip Opinion)     OCTOBER TERM, 2009     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GRANITE ROCK CO. *v.* INTERNATIONAL BROTHERHOOD OF TEAMSTERS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–1214.   Argued January 19, 2010—Decided June 24, 2010

In June 2004, respondent local union (Local), supported by its parent international (IBT), initiated a strike against petitioner Granite Rock, the employer of some of Local's members, following the expiration of the parties' collective-bargaining agreement (CBA) and an impasse in their negotiations. On July 2, the parties agreed to a new CBA containing no-strike and arbitration clauses, but could not reach a separate back-to-work agreement holding local and international union members harmless for any strike-related damages Granite Rock incurred. IBT instructed Local to continue striking until Granite Rock approved such a hold-harmless agreement, but the company refused to do so, informing Local that continued strike activity would violate the new CBA's no-strike clause. IBT and Local responded by announcing a company-wide strike involving numerous facilities and workers, including members of other IBT locals.

Granite Rock sued IBT and Local, invoking federal jurisdiction under §301(a) of the Labor Management Relations Act, 1947 (LMRA), seeking strike-related damages for the unions' alleged breach of contract, and asking for an injunction against the ongoing strike because the hold-harmless dispute was an arbitrable grievance under the new CBA. The unions conceded §301(a) jurisdiction, but asserted that the new CBA was never validly ratified by a vote of Local's members, and, thus, the CBA's no-strike clause did not provide a basis for Granite Rock to challenge the strike. After Granite Rock amended its complaint to add claims that IBT tortiously interfered with the new CBA, the unions moved to dismiss. The District Court granted IBT's motion to dismiss the tortious interference claims on the ground that §301(a) supports a federal cause of action only for breach

of contract. But the court denied Local's separate motion to send the parties' dispute over the CBA's ratification date to arbitration, ruling that a jury should decide whether ratification occurred on July 2, as Granite Rock contended, or on August 22, as Local alleged. After the jury concluded that the CBA was ratified on July 2, the court ordered arbitration to proceed on Granite Rock's breach-of-contract claims. The Ninth Circuit affirmed the dismissal of the tortious interference claims, but reversed the arbitration order, holding that the parties' ratification-date dispute was a matter for an arbitrator to resolve under the CBA's arbitration clause. The Court of Appeals reasoned that the clause covered the ratification-date dispute because the clause clearly covered the related strike claims; national policy favoring arbitration required ambiguity about the arbitration clause's scope to be resolved in favor of arbitrability; and, in any event, Granite Rock had implicitly consented to arbitrate the ratification-date dispute by suing under the contract.

*Held*:

1. The parties' dispute over the CBA's ratification date was a matter for the District Court, not an arbitrator, to resolve. Pp. 6–20.

(a) Whether parties have agreed to arbitrate a particular dispute is typically an "'issue for judicial determination,'" *e.g., Howsam* v. *Dean Witter Reynolds, Inc.,* 537 U. S. 79, 83, as is a dispute over an arbitration contract's formation, see, *e.g., First Options of Chicago, Inc.* v. *Kaplan,* 514 U. S. 938, 944. These principles would neatly dispose of this case if the formation dispute here were typical. But it is not. It is based on when (not whether) the new CBA containing the parties' arbitration clause was ratified and thereby formed. To determine whether the parties' dispute over the CBA's ratification date is arbitrable, it is necessary to apply the rule that a court may order arbitration of a particular dispute only when satisfied that the parties agreed to arbitrate *that dispute.* See, *e.g., id., at* 943. To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the specific arbitration clause that a party seeks to have the court enforce. See, *e.g., Rent-A-Center, West, Inc.* v. *Jackson, ante,* at 4–6. Absent an agreement committing them to an arbitrator, such issues typically concern the scope and enforceability of the parties' arbitration clause. In addition, such issues always include whether the clause was agreed to, and may include when that agreement was formed. Pp. 6–7.

(b) In cases invoking the "federal policy favoring arbitration of labor disputes," *Gateway Coal Co.* v. *Mine Workers*, 414 U. S. 368, 377, courts adhere to the same framework, see, *e.g., AT&T Technologies, Inc.* v. *Communications Workers*, 475 U. S. 643, and discharge their duty to satisfy themselves that the parties agreed to arbitrate a

particular dispute by (1) applying the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand and (2) ordering arbitration only where the presumption is not rebutted, see, *e.g., id.*, at 651–652. Local is thus wrong to suggest that the presumption takes courts outside the settled framework for determining arbitrability. This Court has never held that the presumption overrides the principle that a court may submit to arbitration "only those disputes . . . the parties have agreed to submit," *First Options, supra*, at 943, nor that courts may use policy considerations as a substitute for party agreement, see, *e.g., AT&T Technologies, supra*, at 648−651. The presumption should be applied only where it reflects, and derives its legitimacy from, a judicial conclusion (absent a provision validly committing the issue to an arbitrator) that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed, is legally enforceable, and is best construed to encompass the dispute. See, *e.g., First Options, supra*, at 944–945. This simple framework compels reversal of the Ninth Circuit's judgment because it requires judicial resolution of two related questions central to Local's arbitration demand: when the CBA was formed, and whether its arbitration clause covers the matters Local wishes to arbitrate. Pp. 7–13.

(c) The parties characterize their ratification-date dispute as a formation dispute because a union vote ratifying the CBA's terms was necessary to form the contract. For purposes of determining arbitrability, *when* a contract is formed can be as critical as *whether* it was formed. That is so where, as here, an agreement's ratification date determines its formation date, and thus determines whether its provisions were enforceable during the period relevant to the parties' dispute. This formation date question requires judicial resolution here because it relates to Local's arbitration demand in a way that required the District Court to determine the CBA's ratification date in order to decide whether the parties consented to arbitrate the matters the demand covered. The CBA requires arbitration only of disputes that "arise under" the agreement. The parties' ratification-date dispute does not clearly fit that description. But the Ninth Circuit credited Local's argument that the ratification-date dispute should be presumed arbitrable because it relates to a dispute (the no-strike dispute) that *does* clearly "arise under" the CBA. The Ninth Circuit overlooked the fact that this theory of the ratification-date dispute's arbitrability fails if, as Local asserts, the new CBA was not formed until August 22, because in that case there was no CBA for the July no-strike dispute to "arise under." Local attempts to address this flaw in the Circuit's reasoning by arguing that a December 2004

document the parties executed rendered the new CBA effective as of May 1, 2004, the date the prior CBA expired. The Court of Appeals did not rule on this claim, and this Court need not do so either because it was not raised in Local's brief in opposition to the certiorari petition. Pp. 13–17.

(d) Another reason to reverse the Court of Appeals' judgment is that the ratification-date dispute, whether labeled a formation dispute or not, falls outside the arbitration clause's scope on grounds the presumption favoring arbitration cannot cure. CBA §20 provides, *inter alia,* that "[a]ll disputes arising under this agreement shall be resolved in accordance with the [Grievance] procedure," which includes arbitration. The parties' ratification-date dispute cannot properly be said to fall within this provision's scope for at least two reasons. First, the question whether the CBA was validly ratified on July 2, 2004—a question concerning the CBA's very existence—cannot fairly be said to "arise under" the CBA. Second, even if the "arising under" language could in isolation be construed to cover this dispute, §20's remaining provisions all but foreclose such a reading by describing that section's arbitration requirement as applicable to labor disagreements that are addressed in the CBA and are subject to its requirement of mandatory mediation. The Ninth Circuit's contrary conclusion finds no support in §20's text. That court's only effort to grapple with that text misses the point by focusing on whether Granite Rock's claim to enforce the CBA's *no-strike* provisions could be characterized as "arising under" the agreement, which is not the dispositive issue here. Pp. 17–18.

(e) Local's remaining argument in support of the Court of Appeals' judgment—that Granite Rock "implicitly" consented to arbitration when it sued to enforce the CBA's no-strike and arbitrable grievance provisions—is similarly unavailing. Although it sought an injunction against the strike so the parties could arbitrate the labor grievance giving rise to it, Granite Rock's decision to sue does not establish an agreement, "implicit" or otherwise, to arbitrate an issue (the CBA's formation date) that the company did not raise and has always rightly characterized as beyond the arbitration clause's scope. Pp. 19–20.

2. The Ninth Circuit did not err in declining to recognize a new federal common-law cause of action under LMRA §301(a) for IBT's alleged tortious interference with the CBA. Though virtually all other Circuits have rejected such claims, Granite Rock argues that doing so in this case is inconsistent with federal labor law's goal of promoting industrial peace and economic stability through judicial enforcement of CBAs, and with this Court's precedents holding that a federal common law of labor contracts is necessary to further this goal, see,

*e.g.*, *Textile Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448, 451. The company says the remedy it seeks is necessary because other potential avenues for deterrence and redress, such as state-law tort claims, unfair labor practices claims before the National Labor Relations Board (NLRB), and federal common-law breach-of-contract claims, are either unavailable or insufficient. But Granite Rock has not yet exhausted all of these avenues for relief, so this case does not provide an opportunity to judge their efficacy. Accordingly, it would be premature to recognize the cause of action Granite Rock seeks, even assuming §301(a) authorizes this Court to do so. That is particularly true here because the complained-of course of conduct has already prompted judgments favorable to Granite Rock from the jury below and from the NLRB in separate proceedings concerning the union's attempts to delay the new CBA's ratification. Those proceedings, and others to be conducted on remand, buttress the conclusion that Granite Rock's assumptions about the adequacy of other avenues of relief are questionable, and that the Court of Appeals did not err in declining to recognize the new federal tort Granite Rock requests. Pp. 20–25.

546 F. 3d 1169, reversed in part, affirmed in part, and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, GINSBURG, BREYER, and ALITO, JJ., joined, and in which STEVENS and SOTOMAYOR, JJ., joined as to Part III. SOTOMAYOR, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1214

GRANITE ROCK COMPANY, PETITIONER *v.*
INTERNATIONAL BROTHERHOOD
OF TEAMSTERS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 24, 2010]

JUSTICE THOMAS delivered the opinion of the Court.

This case involves an employer's claims against a local union and the union's international parent for economic damages arising out of a 2004 strike. The claims turn in part on whether a collective-bargaining agreement (CBA) containing a no-strike provision was validly formed during the strike period. The employer contends that it was, while the unions contend that it was not. Because the CBA contains an arbitration clause, we first address whether the parties' dispute over the CBA's ratification date was a matter for the District Court or an arbitrator to resolve. We conclude that it was a matter for judicial resolution. Next, we address whether the Court of Appeals erred in declining the employer's request to recognize a new federal cause of action under §301(a) of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 156, 29 U. S. C. §185(a), for the international union's alleged tortious interference with the CBA. The Court of Appeals did not err in declining this request.

I

Petitioner Granite Rock Company is a concrete and building materials company that has operated in California since 1900. Granite Rock employs approximately 800 employees under different labor contracts with several unions, including respondent International Brotherhood of Teamsters, Local 287 (Local). Granite Rock and Local were parties to a 1999 CBA that expired in April 2004. The parties' attempt to negotiate a new CBA hit an impasse and, on June 9, 2004, Local members initiated a strike in support of their contract demands.[1]

The strike continued until July 2, 2004, when the parties reached agreement on the terms of a new CBA. The CBA contained a no-strike clause but did not directly address union members' liability for any strike-related damages Granite Rock may have incurred before the new CBA was negotiated but after the prior CBA had expired. At the end of the negotiating session on the new CBA, Local's business representative, George Netto, approached Granite Rock about executing a separate "back-to-work" agreement that would, among other things, hold union members harmless for damages incurred during the June 2004 strike. Netto did not make execution of such an agreement a condition of Local's ratification of the CBA, or of Local's decision to cease picketing. Thus, Local did not have a back-to-work or hold-harmless agreement in place when it voted to ratify the CBA on July 2, 2004.

Respondent International Brotherhood of Teamsters (IBT), which had advised Local throughout the CBA nego-

---

[1] In deciding the arbitration question in this case we rely upon the terms of the CBA and the facts in the District Court record. In reviewing the judgment affirming dismissal of Granite Rock's tort claims against respondent International Brotherhood of Teamsters (IBT) for failure to state a claim, we rely on the facts alleged in Granite Rock's Third Amended Complaint. See, *e.g.*, *H. J. Inc.* v. *Northwestern Bell Telephone Co.,* 492 U. S. 229, 250 (1989).

tiations and whose leadership and members supported the June strike, opposed Local's decision to return to work without a back-to-work agreement shielding both Local and IBT members from liability for strike-related damages. In an effort to secure such an agreement, IBT instructed Local's members not to honor their agreement to return to work on July 5, and instructed Local's leaders to continue the work stoppage until Granite Rock agreed to hold Local and IBT members free from liability for the June strike. Netto demanded such an agreement on July 6, but Granite Rock refused the request and informed Local that the company would view any continued strike activity as a violation of the new CBA's no-strike clause. IBT and Local responded by announcing a company-wide strike that involved numerous facilities and hundreds of workers, including members of IBT locals besides Local 287.

According to Granite Rock, IBT not only instigated this strike; it supported and directed it. IBT provided pay and benefits to union members who refused to return to work, directed Local's negotiations with Granite Rock, supported Local financially during the strike period with a $1.2 million loan, and represented to Granite Rock that IBT had unilateral authority to end the work stoppage in exchange for a hold-harmless agreement covering IBT members within and outside Local's bargaining unit.

On July 9, 2004, Granite Rock sued IBT and Local in the District Court, seeking an injunction against the ongoing strike and strike-related damages. Granite Rock's complaint, originally and as amended, invoked federal jurisdiction under LMRA §301(a), alleged that the July 6 strike violated Local's obligations under the CBA's no-strike provision, and asked the District Court to enjoin the strike because the hold-harmless dispute giving rise to the strike was an arbitrable grievance. See *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235, 237–238, 253–254 (1970)

(holding that federal courts may enjoin a strike where a CBA contemplates arbitration of the dispute that occasions the strike). The unions conceded that LMRA §301(a) gave the District Court jurisdiction over the suit but opposed Granite Rock's complaint, asserting that the CBA was not validly ratified on July 2 (or at any other time relevant to the July 2004 strike) and, thus, its no-strike clause did not provide a basis for Granite Rock's claims challenging the strike.

The District Court initially denied Granite Rock's request to enforce the CBA's no-strike provision because Granite Rock was unable to produce evidence that the CBA was ratified on July 2. App. 203–213. Shortly after the District Court ruled, however, a Local member testified that Netto had put the new CBA to a ratification vote on July 2, and that the voting Local members unanimously approved the agreement. Based on this statement and supporting testimony from 12 other employees, Granite Rock moved for a new trial on its injunction and damages claims.

On August 22, while that motion was pending, Local conducted a second successful "ratification" vote on the CBA, and on September 13, the day the District Court was scheduled to hear Granite Rock's motion, the unions called off their strike. Although their return to work mooted Granite Rock's request for an injunction, the District Court proceeded with the hearing and granted Granite Rock a new trial on its damages claims. The parties proceeded with discovery and Granite Rock amended its complaint, which already alleged federal[2] claims for breach of the CBA against both Local and IBT, to add federal inducement of breach and interference with con-

---

[2] This Court has recognized a federal common-law claim for breach of a CBA under LMRA §301(a). See, *e.g.*, *Textile Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448, 456 (1957).

tract (hereinafter tortious interference) claims against
IBT.

IBT and Local both moved to dismiss. Among other
things, IBT argued that Granite Rock could not plead a
federal tort claim under §301(a) because that provision
supports a federal cause of action only for breach of con-
tract. The District Court agreed and dismissed Granite
Rock's tortious interference claims. The District Court did
not, however, grant Local's separate motion to send the
parties' dispute over the CBA's ratification date to arbitra-
tion.[3] The District Court held that whether the CBA was
ratified on July 2 or August 22 was an issue for the court
to decide, and submitted the question to a jury. The jury
reached a unanimous verdict that Local ratified the CBA
on July 2, 2004. The District Court entered the verdict
and ordered the parties to proceed with arbitration on
Granite Rock's breach-of-contract claims for strike-related
damages.

The Court of Appeals for the Ninth Circuit affirmed in
part and reversed in part. See 546 F. 3d 1169 (2008). The
Court of Appeals affirmed the District Court's dismissal of
Granite Rock's tortious interference claims against IBT.
See *id.*, at 1170–1175. But it disagreed with the District
Court's determination that the date of the CBA's ratifica-
tion was a matter for judicial resolution. See *id.*, at 1176–
1178. The Court of Appeals reasoned that the parties'
dispute over this issue was governed by the CBA's arbitra-
tion clause because the clause clearly covered the related
strike claims, the "national policy favoring arbitration"
required that any ambiguity about the scope of the parties'
arbitration clause be resolved in favor of arbitrability, and,

——————

[3] The CBA's ratification date is important to Granite Rock's underly-
ing suit for strike damages. If the District Court correctly concluded
that the CBA was ratified on July 2, Granite Rock could argue on
remand that the July work stoppage violated the CBA's no-strike
clause.

in any event, Granite Rock had "implicitly" consented to arbitrate the ratification-date dispute "by suing under the contract." *Id*., at 1178 (internal quotation marks omitted). We granted certiorari. See 557 U. S. ___ (2009).

## II

It is well settled in both commercial and labor cases that whether parties have agreed to "submi[t] a particular dispute to arbitration" is typically an "'issue for judicial determination.'" *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U. S. 79, 83 (2002) (quoting *AT&T Technologies, Inc.* v. *Communications Workers*, 475 U. S. 643, 649 (1986)); see *John Wiley & Sons, Inc.* v. *Livingston*, 376 U. S. 543, 546–547 (1964). It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide. See, *e.g.*, *First Options of Chicago, Inc.* v. *Kaplan*, 514 U. S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary . . . principles that govern the formation of contracts"); *AT&T Technologies*, *supra*, at 648−649 (explaining the settled rule in labor cases that "'arbitration is a matter of contract'" and "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration"); *Buckeye Check Cashing, Inc.* v. *Cardegna*, 546 U. S. 440, 444, n. 1 (2006) (distinguishing treatment of the generally nonarbitral question whether an arbitration agreement was "ever concluded" from the question whether a contract containing an arbitration clause was illegal when formed, which question we held to be arbitrable in certain circumstances).

These principles would neatly dispose of this case if the formation dispute here were typical. But it is not. It is based on when (not whether) the CBA that contains the parties' arbitration clause was ratified and thereby

formed.[4]  And at the time the District Court considered
Local's demand to send this issue to an arbitrator, Granite
Rock, the party resisting arbitration, conceded both the
formation and the validity of the CBA's arbitration clause.

These unusual facts require us to reemphasize the
proper framework for deciding when disputes are arbitra-
ble under our precedents.  Under that framework, a court
may order arbitration of a particular dispute only where
the court is satisfied that the parties agreed to arbitrate
*that dispute*.  See *First Options*, *supra*, at 943; *AT&T
Technologies*, *supra*, at 648−649.  To satisfy itself that
such agreement exists, the court must resolve any issue
that calls into question the formation or applicability of
the specific arbitration clause that a party seeks to have
the court enforce.  See, *e.g.*, *Rent-A-Center, West, Inc.* v.
*Jackson*, *ante*, at 4−6 (opinion of SCALIA, J.).  Where there
is no provision validly committing them to an arbitrator,
see *ante*, at 7, these issues typically concern the scope of
the arbitration clause and its enforceability.  In addition,
these issues always include whether the clause was agreed
to, and may include when that agreement was formed.

A

The parties agree that it was proper for the District
Court to decide whether their ratification dispute was
arbitrable.[5]  They disagree about whether the District
Court answered the question correctly.  Local contends
that the District Court erred in holding that the CBA's

---

[4] Although a union ratification vote is not always required for the
provisions in a CBA to be considered validly formed, the parties agree
that ratification was such a predicate here.  See App. 349–351.

[5] Because neither party argues that the arbitrator should decide this
question, there is no need to apply the rule requiring "'clear and
unmistakable'" evidence of an agreement to arbitrate arbitrability.
*First Options of Chicago, Inc.* v. *Kaplan*, 514 U. S. 938, 944 (1995)
(quoting *AT&T Technologies, Inc.* v. *Communications Workers*, 475
U. S. 643, 649 (1986) (alterations omitted)).

ratification date was an issue for the court to decide. The Court of Appeals agreed, holding that the District Court's refusal to send that dispute to arbitration violated two principles of arbitrability set forth in our precedents. See 546 F. 3d, at 1177−1178. The first principle is that where, as here, parties concede that they have agreed to arbitrate *some* matters pursuant to an arbitration clause, the "law's permissive policies in respect to arbitration" counsel that "'any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration.'" *First Options*, *supra*, at 945 (quoting *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 626 (1985)); see 546 F. 3d, at 1177−1178 (citing this principle and the "national policy favoring arbitration" in concluding that arbitration clauses "are to be construed very broadly" (internal quotation marks and citations omitted)). The second principle the Court of Appeals invoked is that this presumption of arbitrability applies even to disputes about the enforceability of the entire contract containing the arbitration clause, because at least in cases governed by the Federal Arbitration Act (FAA), 9 U. S. C. §1 *et seq*.,[6] courts must treat the arbitration clause as severable from the contract in which it appears, and thus apply the clause to all disputes within its scope "'[u]nless the [validity] challenge is to the arbitration clause itself'" or the party "disputes the

———————

[6] We, like the Court of Appeals, discuss precedents applying the FAA because they employ the same rules of arbitrability that govern labor cases. See, *e.g., AT&T Technologies*, *supra*, at 650. Indeed, the rule that arbitration is strictly a matter of consent—and thus that courts must typically decide any questions concerning the formation or scope of an arbitration agreement before ordering parties to comply with it— is the cornerstone of the framework the Court announced in the *Steelworkers Trilogy* for deciding arbitrability disputes in LMRA cases. See *Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564, 567−568 (1960); *Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 582 (1960); *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 597 (1960).

formation of [the] contract," 546 F. 3d, at 1176 (quoting *Buckeye*, 546 U. S., at 445−446); 546 F. 3d, at 1177, and n. 4 (explaining that it would treat the parties' arbitration clause as enforceable with respect to the ratification-date dispute because no party argued that the "clause is invalid in any way")).

Local contends that our precedents, particularly those applying the "'federal policy favoring arbitration of labor disputes,'" permit no other result. Brief for Respondent Local, p. 15 (quoting *Gateway Coal Co.* v. *Mine Workers*, 414 U. S. 368, 377 (1974)); see Brief for Respondent Local, pp. 10–13; 16–25. Local, like the Court of Appeals, over-reads our precedents. The language and holdings on which Local and the Court of Appeals rely cannot be divorced from the first principle that underscores all of our arbitration decisions: Arbitration is strictly "a matter of consent," *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 479 (1989), and thus "is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration," *First Options*, 514 U. S., at 943 (emphasis added).[7] Applying this principle, our precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue. *Ibid.* Where a party contests either or both matters, "the court" must resolve the disagreement. *Ibid.*

Local nonetheless interprets some of our opinions to depart from this framework and to require arbitration of

––––––––––

[7] See also *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U. S. 52, 57 (1995); *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 219–220 (1985); *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506, 511 (1974); *AT&T Technologies, supra*, at 648; *Warrior & Gulf, supra*, at 582; *United States* v. *Moorman*, 338 U. S. 457, 462 (1950).

certain disputes, particularly labor disputes, based on
policy grounds even where evidence of the parties' agree-
ment to arbitrate the dispute in question is lacking. See
Brief for Respondent Local, p. 16 (citing cases emphasizing
the policy favoring arbitration generally and the "impres-
sive policy considerations favoring arbitration" in LMRA
cases (internal quotation marks omitted)). That is not a
fair reading of the opinions, all of which compelled arbitra-
tion of a dispute only after the Court was persuaded that
the parties' arbitration agreement was validly formed and
that it covered the dispute in question and was legally
enforceable. See, *e.g.*, *First Options*, *supra*, at 944–945.
That *Buckeye* and some of our cases applying a presump-
tion of arbitrability to certain disputes do not discuss each
of these requirements merely reflects the fact that in those
cases some of the requirements were so obviously satisfied
that no discussion was needed.

In *Buckeye*, the formation of the parties' arbitration
agreement was not at issue because the parties agreed
that they had "concluded" an agreement to arbitrate and
memorialized it as an arbitration clause in their loan
contract. 546 U. S., at 444, n. 1. The arbitration clause's
scope was also not at issue, because the provision ex-
pressly applied to "'[a]ny claim, dispute, or controversy . . .
arising from or relating to . . . the validity, enforceability,
or scope of this Arbitration Provision or the entire Agree-
ment.'" *Id.*, at 442. The parties resisting arbitration
(customers who agreed to the broad arbitration clause as a
condition of using Buckeye's loan service) claimed only
that a usurious interest provision in the loan agreement
invalidated the entire contract, including the arbitration
clause, and thus precluded the Court from relying on the
clause as evidence of the parties' consent to arbitrate
matters within its scope. See *id.*, at 443. In rejecting this
argument, we simply applied the requirement in §2 of the
FAA that courts treat an arbitration clause as severable

from the contract in which it appears and enforce it according to its terms unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself, see *id.*, at 443−445 (citing 9 U. S. C. §2; *Southland Corp.* v. *Keating*, 465 U. S. 1, 4−5 (1984); *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395, 402−404 (1967)), or claims that the agreement to arbitrate was "[n]ever concluded," 546 U. S., at 444, n. 1; see also *Rent-A-Center, ante,* at 6−7, and n. 2.

Our cases invoking the federal "policy favoring arbitration" of commercial and labor disputes apply the same framework. They recognize that, except where "the parties clearly and unmistakably provide otherwise," *AT&T Technologies*, 475 U. S., at 649, it is "the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning" a particular matter, *id.*, at 651. They then discharge this duty by: (1) applying the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and (2) adhering to the presumption and ordering arbitration only where the presumption is not rebutted. See *id.*, at 651–652; *Prima Paint Corp.*, *supra*, at 396–398; *Gateway Coal Co.* v. *Mine Workers*, 414 U. S. 368, 374–377 (1974); *Drake Bakeries Inc.* v. *Bakery Workers*, 370 U. S. 254, 256–257 (1962); *Atkinson* v. *Sinclair Refining Co.*, 370 U. S. 238, 241–242 (1962); *Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 576 (1960).[8]

───────────

[8] That our labor arbitration precedents apply this rule is hardly surprising. As noted above, see n. 6, *supra,* the rule is the foundation for the arbitrability framework this Court announced in the *Steelworkers Trilogy*. Local's assertion that *Warrior & Gulf* suggests otherwise is misplaced. Although *Warrior & Gulf* contains language that might in isolation be misconstrued as establishing a presumption that labor disputes are arbitrable whenever they are not expressly excluded from an arbitration clause, 363 U. S., at 578–582, the opinion elsewhere

Local is thus wrong to suggest that the presumption of arbitrability we sometimes apply takes courts outside our settled framework for deciding arbitrability. The presumption simply assists in resolving arbitrability disputes within that framework. Confining the presumption to this role reflects its foundation in "the federal policy favoring arbitration." As we have explained, this "policy" is merely an acknowledgment of the FAA's commitment to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Volt*, 489 U. S., at 478 (internal quotation marks and citations omitted). Accordingly, we have never held that this policy overrides the principle that a court may submit to arbitration "only those disputes . . . that the parties have agreed to submit." *First Options*, 514 U. S., at 943; see also *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U. S. 52, 57 (1995) ("[T]he FAA's proarbitration policy does not operate without regard to the wishes of the contract parties"); *AT&T Technologies*, 475 U. S., at 650−651 (applying the same rule to the "presumption of arbitrability for labor disputes"). Nor

_____

emphasizes that even in LMRA cases, "courts" must construe arbitration clauses because "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.*, at 582 (applying this rule and finding the dispute at issue arbitrable only after determining that the parties' arbitration clause could be construed under standard principles of contract interpretation to cover it).

Our use of the same rules in FAA cases is also unsurprising. The rules are suggested by the statute itself. Section 2 of the FAA requires courts to enforce valid and enforceable arbitration agreements according to their terms. And §4 provides in pertinent part that where a party invokes the jurisdiction of a federal court over a matter that the court could adjudicate but for the presence of an arbitration clause, "[t]he court shall hear the parties" and "direc[t] the parties to proceed to arbitration in accordance with the terms of the agreement" except "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue," in which case "the court shall proceed summarily to the trial thereof." 9 U. S. C. §4.

have we held that courts may use policy considerations as a substitute for party agreement. See, *e.g.*, *id.*, at 648−651; *Volt*, *supra*, at 478. We have applied the presumption favoring arbitration, in FAA and in labor cases, only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and (absent a provision clearly and validly committing such issues to an arbitrator) is legally enforceable and best construed to encompass the dispute. See *First Options*, *supra*, at 944–945 (citing *Mitsubishi*, 473 U. S., at 626); *Howsam*, 537 U. S., at 83–84; *AT&T Technologies*, *supra*, at 650 (citing *Warrior & Gulf*, *supra*, at 582–583); *Drake Bakeries*, *supra*, at 259–260. This simple framework compels reversal of the Court of Appeals' judgment because it requires judicial resolution of two questions central to Local's arbitration demand: when the CBA was formed, and whether its arbitration clause covers the matters Local wishes to arbitrate.

B

We begin by addressing the grounds on which the Court of Appeals reversed the District Court's decision to decide the parties' ratification-date dispute, which the parties characterize as a formation dispute because a union vote ratifying the CBA's terms was necessary to form the contract. See App. 351.[9] For purposes of determining arbi-

_____

[9] The parties' dispute about the CBA's ratification date presents a formation question in the sense above, and is therefore not on all fours with, for example, the formation disputes we referenced in *Buckeye Check Cashing, Inc.* v. *Cardegna*, 546 U. S. 440, 444, n.1 (2006), which concerned whether, not when, an agreement to arbitrate was "concluded." That said, the manner in which the CBA's ratification date relates to Local's arbitration demand makes the ratification-date dispute in this case one that requires judicial resolution. See *infra*, at 14−19.

trability, *when* a contract is formed can be as critical as *whether* it was formed. That is the case where, as here, the date on which an agreement was ratified determines the date the agreement was formed, and thus determines whether the agreement's provisions were enforceable during the period relevant to the parties' dispute.[10]

This formation date question requires judicial resolution here because it relates to Local's arbitration demand in such a way that the District Court was required to decide the CBA's ratification date in order to determine whether the parties consented to arbitrate the matters covered by the demand.[11] The parties agree that the CBA's arbitration clause pertains only to disputes that "arise under" the agreement. Accordingly, to hold the parties' ratification-date dispute arbitrable, the Court of Appeals had to decide whether that dispute could be characterized as "arising under" the CBA. In answering this question in the affirmative, both Local and the Court of Appeals tied the arbitrability of the ratification-date issue—which Local raised as a defense to Granite Rock's strike claims—to the arbitrability of the strike claims themselves. See *id.*, at 347. They did so because the CBA's arbitration clause, which pertains only to disputes "arising under" the CBA

---

[10] Our conclusions about the significance of the CBA's ratification date to the specific arbitrability question before us do not disturb the general rule that parties may agree to arbitrate past disputes or future disputes based on past events.

[11] In reaching this conclusion we need not, and do not, decide whether every dispute over a CBA's ratification date would require judicial resolution. We recognize that ratification disputes in labor cases may often qualify as "formation disputes" for contract law purposes because contract law defines formation as acceptance of an offer on specified terms, and in many labor cases ratification of a CBA is necessary to satisfy this formation requirement. See App. 349–351. But it is not the mere labeling of a dispute for contract law purposes that determines whether an issue is arbitrable. The test for arbitrability remains whether the parties consented to arbitrate the dispute in question.

and thus presupposes the CBA's existence, would seem plainly to cover a dispute that "arises under" a specific substantive provision of the CBA, but does not so obviously cover disputes about the CBA's own formation. Accordingly, the Court of Appeals relied upon the ratification dispute's relationship to Granite Rock's claim that Local breached the CBA's no-strike clause (a claim the Court of Appeals viewed as clearly "arising under" the CBA) to conclude that "the arbitration clause is certainly 'susceptible of an interpretation' that covers" Local's formation-date defense. 546 F. 3d, at 1177, n. 4.

The Court of Appeals overlooked the fact that this theory of the ratification dispute's arbitrability fails if the CBA was not formed at the time the unions engaged in the acts that gave rise to Granite Rock's strike claims. The unions began their strike on July 6, 2004, and Granite Rock filed its suit on July 9. If, as Local asserts, the CBA containing the parties' arbitration clause was not ratified, and thus not formed, until August 22, there was no CBA for the July no-strike dispute to "arise under," and thus no valid basis for the Court of Appeals' conclusion that Granite Rock's July 9 claims arose under the CBA and were thus arbitrable along with, by extension, Local's formation date defense to those claims.[12]  See *ibid*. For the foregoing reasons, resolution of the parties' dispute about whether the CBA was ratified in July or August was central to deciding Local's arbitration demand.  Accordingly, the Court of Appeals erred in holding that it was not necessary for the District Court to determine the CBA's ratification date in order to decide whether the parties agreed to arbitrate Granite Rock's no-strike claim or the ratification-date dispute Local raised as a defense to that claim.

———————

[12] This analysis pertains only to the Court of Appeals' decision, which did not engage the 11th-hour retroactivity argument Local raised in its merits brief in this Court, and that we address below.

Local seeks to address this flaw in the Court of Appeals' decision by arguing that in December 2004 the parties executed a document that rendered the CBA effective as of May 1, 2004 (the date the prior CBA expired), and that this effective-date language rendered the CBA's arbitration clause (but not its no-strike clause) applicable to the July strike period notwithstanding Local's view that the agreement was ratified in August (which ratification date Local continues to argue controls the period during which the no-strike clause applies). See Brief for Respondent Local, pp. 26–27; Tr. of Oral Arg. 32, 37−39. The Court of Appeals did not rule on the merits of this claim (*i.e.*, it did not decide whether the CBA's effective date language indeed renders some or all of the agreement's provisions retroactively applicable to May 2004), and we need not do so either. Even accepting Local's assertion that it raised this retroactivity argument in the District Court, see Brief for Respondent Local, p. 26,[13] Local did not raise this argument in the Court of Appeals. Nor, more importantly, did Local's brief in opposition to Granite Rock's petition for certiorari raise the argument as an alternative ground on which this Court could or should affirm the Court of Appeals' judgment finding the ratification-date dispute arbitrable for the reasons discussed above. Accordingly, the argument is properly "deemed waived." This Court's Rule 15.2; *Carcieri* v. *Salazar*, 555 U. S. ___, ___ (2009) (slip op., at 15−16).[14]

-----

[13] This claim is questionable because Local's February 2005 references to the agreement "now in effect" are not obviously equivalent to the express retroactivity argument Local asserts in its merits brief in this Court. See Brief for Respondent Local, pp. 26−27.

[14] JUSTICE SOTOMAYOR's conclusion that we should nonetheless excuse Local's waiver and consider the retroactivity argument, see *post*, at 5−6 (opinion concurring in part and dissenting in part), is flawed. This Court's Rule 15.2 reflects the fact that our adversarial system assigns both sides responsibility for framing the issues in a case. The importance of enforcing the Rule is evident in cases where, as here, excusing

C

Although the foregoing is sufficient to reverse the Court of Appeals' judgment, there is an additional reason to do so: The dispute here, whether labeled a formation dispute or not, falls outside the scope of the parties' arbitration clause on grounds the presumption favoring arbitration cannot cure. Section 20 of the CBA provides in relevant part that "[a]ll disputes *arising under this agreement* shall be resolved in accordance with the [Grievance] procedure," which includes arbitration. App. 434 (emphasis added); see also *id.*, at 434–437. The parties' ratification-date dispute cannot properly be characterized as falling within the (relatively narrow, cf., *e.g.*, *Drake Bakeries Inc.*, 370 U. S., at 256–257) scope of this provision for at least two reasons. First, we do not think the question whether the CBA was validly ratified on July 2, 2004—a question that concerns the CBA's very existence—can fairly be said to "arise under" the CBA. Second, even if the "arising under" language could in isolation be construed to cover this dispute, Section 20's remaining provisions all but foreclose such a reading by describing that section's arbitration requirement as applicable to labor disagreements that are addressed in the CBA and are subject to its requirement of mandatory mediation. See App. 434–437 (requiring arbitration of disputes "arising under" the CBA, but only after the Union and Employer have exhausted mandatory mediation, and limiting any arbitration decision under this provision to those "within the scope and terms of this agreement and . . . specifically limited to the matter submitted").

---

a party's noncompliance with it would require this Court to decide, in the first instance, a question whose resolution could affect this and other cases in a manner that the District Court and Court of Appeals did not have an opportunity to consider, and that the parties' arguments before this Court may not fully address.

The Court of Appeals' contrary conclusion does not find support in the text of §20. The Court of Appeals' only effort to grapple with that text misses the point because it focuses on whether Granite Rock's claim to enforce the CBA's *no-strike* provisions could be characterized as "arising under" the agreement. See 546 F. 3d, at 1177, n. 4. Even assuming *that* claim can be characterized as "arising under" the CBA, it is not the issue here. The issue is whether the formation-date defense that Local raised in response to Granite Rock's no-strike suit can be characterized as "arising under" the CBA. It cannot for the reasons we have explained, namely, the CBA provision requiring arbitration of disputes "arising under" the CBA is not fairly read to include a dispute about when the CBA came into existence. The Court of Appeals erred in failing to address this question and holding instead that the arbitration clause is "susceptible of an interpretation" that covers Local's formation-date defense to Granite Rock's suit "[b]ecause Granite Rock is suing 'under' the alleged new CBA" and "[a]rbitration clauses are to be construed very broadly." *Ibid.;* see also *id.*, at 1178.

D

Local's remaining argument in support of the Court of Appeals' judgment is similarly unavailing. Local reiterates the Court of Appeals' conclusion that Granite Rock "implicitly" consented to arbitration when it sued to enforce the CBA's no-strike and arbitrable grievance provisions. See Brief for Respondent Local, pp. 17–18. We do not agree that by seeking an injunction against the strike so the parties could arbitrate the labor grievance that gave rise to it, Granite Rock also consented to arbitrate the ratification (formation) date dispute we address above. See 564 F. 3d, at 1178. It is of course true that when Granite Rock sought that injunction it viewed the CBA (and all of its provisions) as enforceable. But Granite

Rock's decision to sue for compliance with the CBA's grievance procedures on strike-related matters does not establish an agreement, "implicit" or otherwise, to arbitrate an issue (the CBA's formation date) that Granite Rock did not raise, and that Granite Rock has always (and rightly, see Part II–C, *supra*) characterized as beyond the scope of the CBA's arbitration clause. The mere fact that Local raised the formation date dispute as a defense to Granite Rock's suit does not make that dispute attributable to Granite Rock in the waiver or estoppel sense the Court of Appeals suggested, see 546 F. 3d, at 1178, much less establish that Granite Rock agreed to arbitrate it by suing to enforce the CBA as to other matters. Accordingly, we hold that the parties' dispute over the CBA's formation date was for the District Court, not an arbitrator, to resolve, and remand for proceedings consistent with that conclusion.

## III

We turn now to the claims available on remand. The parties agree that Granite Rock can bring a breach-of-contract claim under LMRA §301(a) against Local as a CBA signatory, and against IBT as Local's agent or alter ego. See Brief for Respondent IBT 10–13; Reply Brief for Petitioner 12–13 and n. 11.[15] The question is whether

_____

[15] Although the parties concede the general availability of such a claim against IBT, they dispute whether Granite Rock abandoned its agency or alter ego allegations in the course of this litigation. Compare Brief for Respondent IBT, p. 10 with Reply Brief for Petitioner 12–13, n. 11. Granite Rock concedes that it has abandoned its claim that IBT acted as Local's undisclosed principal in orchestrating the ratification response to the July 2, 2004, CBA. See Plaintiff Granite Rock's Memorandum of Points and Authorities in Opposition to Defendant IBT's Motion to Dismiss in No. 5:04–cv–02767–JW (ND Cal., Aug. 7, 2006), Doc. 178, pp. 6, 8 (hereinafter Points and Authorities). But Granite Rock insists that it preserved its argument that Local served as IBT's agent or alter ego when Local denied ratification and engaged in

Granite Rock may also bring a federal tort claim under
§301(a) for IBT's alleged interference with the CBA.[16]
Brief for Petitioner 32. The Court of Appeals joined virtu-
ally all other Circuits in holding that it would not recog-
nize such a claim under §301(a).

Granite Rock asks us to reject this position as inconsis-
tent with federal labor law's goal of promoting industrial
peace and economic stability through judicial enforcement
of CBAs, as well as with our precedents holding that a
federal common law of labor contracts is necessary to
further this goal. See *id.*, at 31; see also, *e.g.*, *Textile
Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448, 451 (1957).
Explaining that IBT's conduct in this case undermines the
very core of the bargaining relationship federal labor laws
exist to protect, Granite Rock argues that a federal
common-law tort remedy for IBT's conduct is necessary
because other potential avenues for deterring and redress-
ing such conduct are either unavailable or insufficient.
See Brief for Petitioner 32–33; Reply Brief for Petitioner
19–20. On the unavailable side of the ledger Granite Rock
lists state-law tort claims, some of which this Court has
held §301(a) pre-empts, as well as administrative (unfair
labor practices) claims, which Granite Rock says the Na-
tional Labor Relations Board (NLRB) cannot entertain

———————

unauthorized strike activity in July 2004. Nothing in the record before
us unequivocally refutes this assertion. See App. 306, 311–315, 318;
Points and Authorities 6, n. 3. Accordingly, nothing in this opinion
forecloses the parties from litigating these claims on remand.

[16] IBT argues that we should dismiss this question as improvidently
granted because Granite Rock abandoned its tortious interference claim
when it declared its intention to seek only contractual (as opposed to
punitive) damages on the claim. See Brief for Respondent IBT 16. We
reject this argument, which confuses Granite Rock's decision to forgo
the pursuit of punitive damages on its claim with a decision to abandon
the claim itself. The two are not synonymous, and IBT cites no author-
ity for the proposition that Granite Rock must allege more than eco-
nomic damages to state a claim on which relief could be granted.

against international unions that (like IBT) are not part of the certified local bargaining unit they allegedly control. On the insufficient side of the ledger Granite Rock lists federal common-law breach-of-contract claims, which Granite Rock says are difficult to prove against non-CBA signatories like IBT because international unions structure their relationships with local unions in a way that makes agency or alter ego difficult to establish. Based on these assessments, Granite Rock suggests that this case presents us with the choice of either recognizing the federal common-law tort claim Granite Rock seeks or sanctioning conduct inconsistent with federal labor statutes and our own precedents. See Brief for Petitioner 13–14.

We do not believe the choice is as stark as Granite Rock implies. It is of course true that we have construed "Section 301 [to] authoriz[e] federal courts to fashion a body of federal law for the enforcement of collective bargaining agreements." *Lewis* v. *Benedict Coal Corp.*, 361 U. S. 459, 470 (1960) (citing *Lincoln Mills*, *supra*). But we have also emphasized that in developing this common law we "did not envision any freewheeling inquiry into what the federal courts might find to be the most desirable rule." *Howard Johnson Co.* v. *Hotel Employees*, 417 U. S. 249, 255 (1974). The balance federal statutes strike between employer and union relations in the collective-bargaining arena is carefully calibrated, see, *e.g.*, *NLRB* v. *Drivers*, 362 U. S. 274, 289–290 (1960), and as the parties' briefs illustrate, creating a federal common-law tort cause of action would require a host of policy choices that could easily upset this balance, see Brief for Respondent IBT 42–44; Reply Brief for Petitioner 22–25. It is thus no surprise that virtually all Courts of Appeals have held that federal courts' authority to "create a federal common law *of collective bargaining agreements* under section 301" should be confined to "a common law of contracts, not a source of independent rights, let alone tort rights; for

section 301 is . . . a grant of jurisdiction only to enforce contracts." *Brazinski* v. *Amoco Petroleum Additives Co.*, 6 F. 3d 1176, 1180 (CA7 1993). We see no reason for a different result here because it would be premature to recognize the federal common law tort Granite Rock requests in this case even assuming that §301(a) authorizes us to do so.

In reaching this conclusion, we emphasize that the question before us is a narrow one. It is not whether the conduct Granite Rock challenges is remediable, but whether we should augment the claims already available to Granite Rock by creating a new federal common-law cause of action under §301(a). That we decline to do so does not mean that we approve of IBT's alleged actions. Granite Rock describes a course of conduct that does indeed seem to strike at the heart of the collective-bargaining process federal labor laws were designed to protect. As the record in this case demonstrates, however, a new federal tort claim is not the only possible remedy for this conduct. Granite Rock's allegations have prompted favorable judgments not only from a federal jury, but also from the NLRB. In proceedings that predated those in which the District Court entered judgment for Granite Rock on the CBA's formation date,[17] the NLRB concluded that a "complete agreement" was reached on July 2, and that Local and IBT violated federal labor laws by attempting to delay the CBA's ratification pending execution of a separate agreement favorable to IBT. See *In re Teamsters Local 287,* 347 N. L. R. B. 339, 340–341, and n. 1 (2006) (applying the remedial order on the 2004 conduct to both

---

[17] Although the Board and federal jury reached different conclusions with respect to the CBA's ratification date, the discrepancy has little practical significance because the Board's remedial order against Local and IBT gives "retroactive effect to the terms of the [CBA of] July 2, 2004, as if ratified on that date." *In re Teamsters Local 287,* 347 N. L. R. B. 339, 340 (2006).

Local and IBT on the grounds that IBT did not disaffiliate from the AFL–CIO until July 25, 2005).

These proceedings, and the proceedings that remain to be conducted on remand, buttress our conclusion that Granite Rock's case for a new federal common-law cause of action is based on assumptions about the adequacy of other avenues of relief that are at least questionable because they have not been fully tested in this case and thus their efficacy is simply not before us to evaluate. Notably, Granite Rock (like IBT and the Court of Appeals) assumes that federal common law provides the only possible basis for the type of tort claim it wishes to pursue. See Brief for Respondent IBT 33–34; Reply Brief for Petitioner 16. But Granite Rock did not litigate below, and thus does not present us with occasion to address, whether state law might provide a remedy. See, *e.g.*, *Steelworkers* v. *Rawson*, 495 U. S. 362, 369−371 (1990); *Textron Lycoming Reciprocating Engine Div., AVCO Corp.* v. *Automobile Workers*, 523 U. S. 653, 656, 658 (1998). Nor did Granite Rock fully explore the breach-of-contract and administrative causes of action it suggests are insufficient to remedy IBT's conduct. For example, far from establishing that an agency or alter ego claim against IBT would be unsuccessful, the record in this case suggests it might be easier to prove than usual if, as the NLRB's decision observes, IBT and Local were affiliated in 2004 in a way relevant to Granite Rock's claims. See *In re Teamsters Local 287, supra,* at 340, n. 6. Similarly, neither party has established that the Board itself could not issue additional relief against IBT. IBT's *amici* argue that the "overlap between Granite Rock's §301 claim against the IBT and the NLRB General Counsel's unfair labor practice complaint against Local 287 brings into play the National Labor Relations Act rule that an international union commits an unfair labor practice by causing its affiliated local unions to 'impose extraneous non-bargaining unit

considerations into the collective bargaining process.'" Brief for American Federation of Labor et al. 30–31 (quoting *Paperworkers Local 620*, 309 N. L. R. B. 44, 44 (1992)). The fact that at least one Court of Appeals has recognized the viability of such a claim, see *Kobell* v. *United Paperworkers Int'l Union*, 965 F. 2d 1401, 1407−1409 (CA6 1992), further persuades us that Granite Rock's arguments do not justify recognition of a new federal tort claim under §301(a).

*          *          *

We reverse the Court of Appeals' judgment on the arbitrability of the parties' formation-date dispute, affirm its judgment dismissing Granite Rock's claims against IBT to the extent those claims depend on the creation of a new federal common-law tort cause of action under §301(a), and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 08–1214

GRANITE ROCK COMPANY, PETITIONER *v.*
INTERNATIONAL BROTHERHOOD
OF TEAMSTERS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 24, 2010]

JUSTICE SOTOMAYOR, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

I join Part III of the Court's opinion, which holds that petitioner Granite Rock's tortious interference claim against respondent International Brotherhood of Teamsters (IBT) is not cognizable under §301(a) of the Labor Management Relations Act, 1947 (LMRA), 29 U. S. C. §185(a). I respectfully dissent, however, from the Court's conclusion that the arbitration provision in the collective-bargaining agreement (CBA) between Granite Rock and IBT Local 287 does not cover the parties' dispute over whether Local 287 breached the CBA's no-strike clause. In my judgment, the parties clearly agreed in the CBA to have this dispute resolved by an arbitrator, not a court.

The legal principles that govern this case are simpler than the Court's exposition suggests. Arbitration, all agree, "is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." *Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 582 (1960). Before ordering parties to arbitrate, a court must therefore confirm (1) that the parties have an agreement to arbitrate and (2) that the agreement covers their dispute. See *ante*, at 9. In determining the scope of an arbitration agreement, "there

is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT&T Technologies, Inc.* v. *Communications Workers*, 475 U. S. 643, 650 (1986) (quoting *Warrior*, 363 U. S., at 582–583); see also *John Wiley & Sons, Inc.* v. *Livingston*, 376 U. S. 543, 550, n. 4 (1964) ("[W]hen a contract is scrutinized for evidence of an intention to arbitrate a particular kind of dispute, national labor policy requires, within reason, that an interpretation that covers the asserted dispute . . . be favored" (emphasis deleted; internal quotation marks omitted)).[1]

The application of these established precepts to the facts of this case strikes me as equally straightforward: It is undisputed that Granite Rock and Local 287 executed a CBA in December 2004. The parties made the CBA retroactively "effect[ive] from May 1, 2004," the day after the expiration of their prior collective-bargaining agreement. App. to Pet. for Cert. A–190. Among other things, the CBA prohibited strikes and lockouts. *Id.*, at A–181. The CBA authorized either party, in accordance with certain grievance procedures, to "refe[r] to arbitration" "[a]ll disputes arising under this agreement," except for three

———————

[1] When the question is "'*who* (primarily) should decide arbitrability'" (as opposed to "'*whether* a particular merits-related dispute is arbitrable'"), "the law reverses the presumption." *First Options of Chicago, Inc.* v. *Kaplan*, 514 U. S. 938, 944–945 (1995). In other words, "[u]nless the parties clearly and unmistakably provide otherwise," it is presumed that courts, not arbitrators, are responsible for resolving antecedent questions concerning the scope of an arbitration agreement. *AT&T Technologies, Inc.* v. *Communications Workers*, 475 U. S. 643, 649 (1986). As the majority correctly observes, *ante*, at 7, n. 5, this case does not implicate the reversed presumption because both parties accept that a court, not an arbitrator, should resolve their current disagreement about whether their underlying dispute is arbitrable.

specified "classes of disputes" not implicated here. *Id*., at A–176 to A–179.

Granite Rock claims that Local 287 breached the CBA's no-strike clause by engaging in a work stoppage in July 2004. Local 287 contests this claim. Specifically, it contends that it had no duty to abide by the no-strike clause in July because it did not vote to ratify the CBA until August. As I see it, the parties' disagreement as to whether the no-strike clause proscribed the July work stoppage is plainly a "disput[e] arising under" the CBA and is therefore subject to arbitration as Local 287 demands. Indeed, the parties' no-strike dispute is indistinguishable from myriad other disputes that an employer and union might have concerning the interpretation and application of the substantive provisions of a collective-bargaining agreement. These are precisely the sorts of controversies that labor arbitrators are called upon to resolve every day.

The majority seems to agree that the CBA's arbitration provision generally encompasses disputes between Granite Rock and Local 287 regarding the parties' compliance with the terms of the CBA, including the no-strike clause. The majority contends, however, that Local 287's "formation-date defense" raises a preliminary question of contract formation that must be resolved by a court rather than an arbitrator. *Ante*, at 15. The majority's reasoning appears to be the following: If Local 287 did not ratify the CBA until August, then there is "no valid basis" for applying the CBA's arbitration provision to events that occurred in July. *Ibid*.

The majority's position is flatly inconsistent with the language of the CBA. The parties expressly chose to make the agreement effective from May 1, 2004. As a result, "the date on which [the] agreement was ratified" does not, as the majority contends, determine whether the parties' dispute about the permissibility of the July work stoppage

falls within the scope of the CBA's arbitration provision. *Ante*, at 14. When it comes to answering the arbitrability question, it is entirely irrelevant whether Local 287 ratified the CBA in August (as it contends) or in July (as Granite Rock contends). In either case, the parties' dispute—which postdates May 1—clearly "aris[es] under" the CBA, which is all the arbitration provision requires to make a dispute referable to an arbitrator. Cf. *Litton Financial Printing Div., Litton Business Systems, Inc.* v. *NLRB*, 501 U. S. 190, 201 (1991) (recognizing that "a collective-bargaining agreement might be drafted so as to eliminate any hiatus between expiration of the old and execution of the new agreement").[2]

Given the CBA's express retroactivity, the majority errs in treating Local 287's ratification-date defense as a "formation dispute" subject to judicial resolution. *Ante*, at 13. The defense simply goes to the merits of Granite Rock's claim: Local 287 maintains that the no-strike clause should not be construed to apply to the July work stoppage because it had not ratified the CBA at the time of that action. Cf. *First Options of Chicago, Inc.* v. *Kaplan*, 514 U. S. 938, 942 (1995) (distinguishing a disagreement that "makes up the *merits* of the dispute" from a disagreement "about the *arbitrability* of the dispute"). Accordingly, the defense is necessarily a matter for the arbitrator, not the court. See *AT&T*, 475 U. S., at 651 ("[I]t is for the arbitrator to determine the relative merits of the parties' sub-

—————

[2] Notably, at the time they executed the CBA in December 2004, the parties were well aware that they disagreed about the legitimacy of the July work stoppage. Yet they made the CBA retroactive to May and declined to carve out their no-strike dispute from the arbitration provision, despite expressly excluding three other classes of disputes from arbitration. Cf. *Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 584–585 (1960) ("In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail").

stantive interpretations of the agreement"). Indeed, this Court has been emphatic that "courts . . . have no business weighing the merits of the grievance." *Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564, 568 (1960). "When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the [arbitration provisions] of collective bargaining agreements, it usurps a function . . . entrusted to the arbitration tribunal." *Id.*, at 569; see also *AT&T*, 475 U. S., at 649 ("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims"); *Warrior*, 363 U. S., at 582, 585 ("[T]he judicial inquiry under [LMRA] §301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance"; "the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement").

Attempting to sidestep this analysis, the majority declares that Local 287 waived its retroactivity argument by failing in the courts below to challenge Granite Rock's consistent characterization of the parties' dispute as one of contract formation. See *ante*, at 16. As a result of Local 287's omission, the District Court and Court of Appeals proceeded under the understanding that this case presented a formation question. It was not until its merits brief in this Court that Local 287 attempted to correct this mistaken premise by pointing to the parties' execution of the December 2004 CBA with its May 2004 effective date. This Court's rules "admonis[h] [counsel] that they have an obligation to the Court to point out in the brief in opposition [to certiorari], and not later, any perceived misstatement made in the petition [for certiorari]"; nonjurisdictional arguments not raised at that time "may be deemed waived." This Court's Rule 15.2. Although it is regrettable and inexcusable that Local 287 did not present its

argument earlier, I do not see it as one we can ignore. The question presented in this case presupposes that "it is disputed whether any binding contract exists." Brief for Petitioner i. Because it is instead undisputed that the parties executed a binding contract in December 2004 that was effective as of May 2004, we can scarcely pretend that the parties have a formation dispute. Consideration of this fact is "a 'predicate to an intelligent resolution' of the question presented, and therefore 'fairly included therein.'" *Ohio* v. *Robinette*, 519 U. S. 33, 38 (1996) (quoting *Vance* v. *Terrazas*, 444 U. S. 252, 258, n. 5 (1980); this Court's Rule 14.1(a)). Indeed, by declining to consider the plain terms of the parties' agreement, the majority offers little more than "an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227, 241 (1937). In view of the CBA's effective date, I would hold that the parties agreed to arbitrate the no-strike dispute, including Local 287's ratification-date defense, and I would affirm the judgment below on this alternative ground. Cf. *Dandridge* v. *Williams*, 397 U. S. 471, 475, n. 6 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of [the] judgment, whether or not that ground was relied upon or even considered by the trial court").